## Atha v. Webster, et al.

### (Decided October 11, 1918.)

### Appeal from Grant Circuit Court.

1. Deeds—Mistake—Action to Set Aside.—In order for one to have relief on account of mistake of fact, in the execution of a deed, it must clearly appear that the mistake was mutual and the evidence must be convincing.

2. Deeds—Mistake—Action to Set Aside.—Parties who deliberately and carefully enter into a contract to execute deeds to one another for different tracts of real property and the deeds thereafter are executed, are not entitled to have the deeds set aside on the ground of mistake in their execution unless the evidence of mistake is clear and convincing.

3. Gifts—Validity—Contest.—A gift of personal property, or money, in order to be valid must be accompanied by possession or there must be some clear and unmistakable expression on the part of the donor indicating a gift, and in a contest over the gift, words that merely indicate a purpose to make a gift in the future are not sufficient, unsupported, to establish the gift.

J. J. BLACKBURN and W. W. DICKERSON for appellant.

TOMLIN & VEST for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

Thomas and Mary Atha, who resided near Zion Station, in Grant county, died intestate in 1915, each leaving property. They were survived by two sons and two daughters. Thomas Atha was eighty-seven years old and his wife eighty-six years old at the time of death. He died February 1st, and she in November following. He was the owner of a farm of about one hundred and eighty-five acres, valued at $5,000.00, and also a house

and lot at Zion Station, appraised at $500.00. He owned personal property of the value of $404.00, and had on deposit in bank and in possession about $100.00. The wife, Mary Atha, had on deposit in bank $2,000.00. For some years before the death of these old people their son, Jerry Atha, lived on the farm with them and provided for and took care of them. The other brother lived in Covington, and the two daughters resided some distance away. After the death of the old gentleman, Jerry moved into the house with his mother and continued to live there until after her death. Within a month after the death of Thomas Atha, on February 1st, Isabell Webster and her sister, Joan Webster, the two daughters of the deceased, came to the home of appellant, Jerry Atha, and stated to him that they desired a division of the estate of their father. Jerry informed his sisters that he claimed $1,350.00 for services for waiting on and taking care of his father during his last years, and proposed that he would take $1,000 in land or money and the house and lot owned by his father at Zion Station in satisfaction of his claim. After thinking it over for several days the sisters returned and made a counter proposition to Jerry that if Jerry and the other brother, James, would deed to the daughters the house and lot at Zion Station, free from all claim of dower and from the claim of Jerry for waiting upon and caring for the father, that they, the daughters, would deed to the sons, Jerry and James, the farm of 185 acres, subject to the dower of the widow, who was then living, and to the claim for $1,350.00 of Jerry's. Jerry agreed to this, but James was not present, and Daniel Webster, husband of Isabell, was sent to Covington to see him and get his consent to the bargain. Webster returned and brought the information that James was willing to accept the proposition. Thereupon the parties sought out Dr. Tomlin, notary public at Zion Station, and procured him to prepare the deeds. Both sides explained the trade to Dr. Tomlin and directed him how to prepare the deeds. A few days later the parties again met at Zion Station for the purpose of signing and acknowledging the deeds which Dr. Tomlin had prepared in the meantime. The deeds were carefully read over to all the parties, Jerry Atha, Isabell Webster and her husband, Daniel Webster, Joan Webster and her husband, William Webster, and the contents and effect of the instruments fully explained to all of them. The

deeds were then signed and duly acknowledged before the officer, and the parties went their way. The daughters took possession of the house and lot at Zion Station and began to collect rents from it, and Jerry took possession of the farm, which was the old home place. His mother lived with him and he and his family took care of her until she died, in November, 1915. Jerry paid all burial expenses of both his father and mother and erected a suitable monument to mark their graves. In doing this he expended $759.00. Some time after the death of the widow, Mary Atha, this suit was instituted by the daughters against the two sons alleging mistake of law and fact in the execution of the deeds, and asking to have the same set aside and cancelled, and that the estate of Thomas Atha and Mary Atha be settled and that the daughters share and share alike with the sons in the proceeds of the two estates. It was adjudged by the trial court that the agreement as set forth in plaintiffs' petition as amended should be carried out in such a way as to give Jerry Atha a preference of $1,350.00 before any of the other heirs could receive anything, and that the two deeds set out and described in the petition be cancelled, set aside and held for naught, and that the four children of Thomas and Mary Atha participate in both estates after the payment to Jerry of the $1,350.00 preference.

It seems to have been conceded by all parties concerned that the appellant, Jerry Atha, was entitled to $1,350.00 out of his father's estate for the care and attention which he gave the deceased during the several years next before his demise. It is also conceded that the farm was reasonably worth $5,000.00, and that the house and lot was worth about $500.00; that the old gentleman had personal property worth $404.00, and cash $100.00; that the mother, Mary Atha, had $2,000.00 in bank in her own right; that Jerry Atha expended $759.00 for burial expenses and the erection of a monument. There is, however, much conflicting evidence as to the trade made between Jerry and his sister, Isabell, out of which the two deeds came. It is rather difficult to understand from this record just what the contention of the plaintiffs, Isabel Webster, and her sister, Joan Webster, is with reference to the mistake which they assert was made in the drawing of the deeds. With reference to the trade Isabell Webster testifies as follows:

"Q. When did Thomas Atha die? A. He died on the first of February, 1915. Q. 1915? A. Yes sir. Q. Shortly after his death if you did anything with reference to taking steps toward a settlement of your father's estate or division of his property among the four children, state to the court what you did, where you were, who you saw and what was said. A. You mean when I come to see Jerry about the settlement? Q. Yes, go ahead and tell all about that? A. In the first place I come to William Webster, and me and his wife come over, but we didn't settle that day. That day we asked Jerry what he wanted out of the estate. Q. You used the name of William Webster's wife—who is she? A. That is Joan—my sister. Q. Now go ahead with your answer about the settlement. A. We went over to my mother's house to see Jerry, and I asked him what he wanted, and he said he wanted $1,000.00 in land and the Zion Station property for what he had done for our father, and then wanted to come in heir on all the rest of it. Q. Now you spoke in your former answer of Jerry wanting $1,000.00 in land and also the Zion Station property for what he had done for your father. What did Jerry claim at that time to you to have done for your father? A. For waiting on our father. He said he wanted $1,000.00 in land and the Zion Station property for waiting on our father. He claimed that in the division. Q. In other words, he was claiming $1,000.00 in land and the Zion Station property in addition to his *pro rata* share of the rest of the estate; he was to have that or was claiming that, and then the remainder of the estate of your father was to be equally divided betwen the four children? A. He said he wanted to come in heir on all the rest. Q. Was your sister Joan with you on the occasion you have just mentioned? A. She was with me on the first trip, but not at the time Jerry and me settled. . . . In a few days I went back to my mother's house and saw Jerry there.

.   .   .   .   .   .   .   .   .   .   ,   .   .   .   .   .

"Q. Was anybody with you on this occasion? A. No sir, no one was with us—just me and him together when we settled. . . . Well, what I mean by that is this, Jerry was still wanting the same when I went back to see him as he was before. I studied the matter over and I asked him if me and my sister would take the Zion

Station property and let him take enough land to make up for that, if that would be all right. He said he would not do it; that he told us all he would do. The way he wanted it was this—he wanted $1,000.00 in land and the Zion Station property, for waiting on our father. We was to come in heir, all of us, on our mother's part. I talked with him, and I said, Jerry, you know you are getting a few hundred dollars ahead of us that way, and he said he couldn't help it. After a while I told him that I would see my sister and tell it to her and if she thinks it is all right, notwithstanding that we believe you are getting a few hundred dollars ahead of us, we will let you and your brother, James, have the remainder of our father's part, but understand, not our mother's part. I went away and saw my sister and we talked the matter over and she said, 'That way they are getting ahead of us.' I said, 'I know they are.' He wouldn't agree to anything without trouble, so we concluded as it was our own brothers we would let Jerry have it, all the time believing that we would come in on our mother's part, both the dowery and money. We arranged that we would meet at Dr. Tomlin's office and have the deeds wrote We went to Dr. Tomlin's office and when we went there Jerry forgot the deed—forgot to bring it with him. While we was there at Dr. Tomlin's office I told Dr. Tomlin, I said, 'We are only settling our father's part and not our mother's part.' On account of Jerry not having the deed with him that day Dr. Tomlin could not fix up the papers that day, and he said, 'All of you meet me at Zion Station on a certain date and sign the papers.' I told him we would meet him there if the weather would permit. We got to Zion Station the day set, about nine o'clock, and when Dr. Tomlin come he had the deeds already wrote, and he come in and called us to hear the deed read and I didn't see anything in it to cut us out, of our mother's part, so I signed it, believing all the time I was not to be cut out of my mother's part, both the dowery and the money. Q. It was understood between you that this trade referred to your father's estate, and had no reference to the dower which belonged to your mother, or the money which belonged to a fund and part of your mother's estate? A. We didn't settle that part of it at all. We didn't settle only our father's part of the estate, and not mother's part at all.

•  •  •  •  •  •  •  •  •  •  •  •  •  •  •  •

"Q. At the time you signed this deed did you understand and know and realize that you were signing away the entire farm, or did you believe you were conveying it subject to your mother's dower? A. I believed I was signing away my father's part but not my mother's part.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Would you have signed the deed at the time of its execution had you known it conveyed the land absolutely and did not exempt your mother's dower? A. No, sir, ·if I had understood it at the time, that was I wouldn't have signed it at all, for I thought I was signing away only my father's part of the estate and not my mother's part; I wouldn't have signed away my mother's part if I had known it."

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

In explaining what she understood by the word "dower" Mrs. Webster was asked the following questions:

"Q. Did you understand when you were talking about dower that your mother had no interest in that estate except the right of dower? A. I don't understand what you want to know, Mr. Blackburn. Q. You understand what the rights of the widow is in the property of her husband? A. I always heard and understood it was one-third of everything. Q. Did you understand that she would get one-third of the land to dispose of as she pleased? A. I understood she got one-third of it. Q. Did she get one-third for life? A. No sir; one-third; a dower."

Dr. Tomlin, the notary public who drew the deeds, was called also and testified. He was asked:

"Q. Doctor, who first spoke to you about this matter? A. I believe it was Dan Webster and his wife. Q. In preparing these deeds, the deed from Jerry and James Atha to Isabell Webster and Joan Webster, and from them to Jerry and James Atha—as they now read—do you think these two girls intended to convey that 185 acre farm to Jerry and James Atha in fee? A. That is the way I was directed to write the deeds—I think they fully understood that. The only question that came up, at the time, to my recollection, is they mentioned the personal property, or the money, and said that wasn't to be considered in the trade. . . . I asked them at the time if they understood everything and they said

they did. I asked them if they understood what they were signing, and they said they did. Q. No full and ample explanations were made on the second occasion was there, doctor? A. I think I told them they were covering their entire interest in that land—in the farm. Q. In the farm, or their father's estate? A. The farm. Q. Do you recall of using the term 'farm?' A. I think I did. Q. Are you able to state now positively that that full explanation was made to them, or can't you be mistaken as to the completeness of the explanation made? A. I took particular pains to explain everything.

. . . . . . . . . . . . . .

"Q. You say that you are positive that in all these transactions that it was distinctly understood by all the parties, including yourself, that these deeds and conveyances and settlements absolutely did not undertake to settle or attempt to settle, or have any dealing with the personal property amounting to something like $2,000.00. A. It was mentioned that the personal property wasn't considered in that trade at all. Q. That was understood by Jerry as well as the rest of them? A. I think so; that is my understanding."

To entitle one to have a deed, a solemn instrument, reformed or set aside for mistake, the evidence must be clear and convincing. As said in Ashmore v. Hannen, 157 Ky. 437: "Equity will not grant relief in cases of alleged mistake except upon very clear evidence; and where the fact of mistake is denied, evidence to overcome the denial must be of the most persuasive character."

From the evidence we conclude that the parties actually entered into the contract which the deeds evidence, and that there was in fact no mistake unless the daughters were laboring under the belief that their mother, Mary Atha, would take a one-third interest in fee, as appears may have been the understanding of Isabell. But even this does not appear to accord with the facts because the deed which Isabell and Joan made to Jerry and James for the 185 acres is in form a general warranty conveyance, with no exceptions or reservations. Likewise, the deed from James and Jerry to Isabell and Joan for the house and lot at Zion Station was a conveyance of the fee. The daughters were to have the house and lot at the station free from all claim

of dower and free from the claim of Jerry for $1,350.00 for waiting upon the father, while Jerry and James took the farm with the burden of the dower as well as the $1,350.00 claim. No doubt the daughters and their husbands considered the matter carefully during the week or two which passed between the making of the proposition and the execution of the deeds, and came to the conclusion that as the widow was yet living, and entitled to dower in the lands and she had to be supported and cared for and was likely to live some years, that it would not be a bad bargain for them to take the unincumbered property and allow Jerry and James to take the incumbered property, even if it was worth more than the house and lot. This trade seems to have been made deliberately on the part of Isabell and Joan Webster, and to have been carefully considered. In fact, Isabell proposed the trade and Jerry and James consented to it. The evidence does not disclose any bad faith or improper conduct on the part of Jerry in conducting the negotiations. True, it turned out that Jerry made an excellent bargain, but if the widow had lived for three or four or five years, as was within reasonable probability at the time the deeds were made, his bargain would not have been so good. In fact, it would have proved an onerous one. We, therefore, conclude from all the evidence the chancellor erred in holding the deeds null and void.

Let us consider now the other questions in the case. Jerry admits that he received the $2,000 which was on deposit in the bank to his mother's account. He states that some time before the death of his father this money was transferred on the books of the bank to the names of Thomas, Mary and Jerry Atha, and that this arrangement was suggested by Mary Atha so that in case of her death Thomas and Jerry Atha might draw the money if they, or either of them, were living, and if Jerry should outlive his parents that he alone should have and control the money. Other evidence introduced tends to show that Mary Atha, in her last days, repeatedly stated that she desired what money she had to go to those who cared for her and that she intended to so give it. But there is no evidence in record sufficient in our judgment to warrant a court in concluding that she did in fact give this money to her son Jerry or to anyone else, although

she may have fully intended to do so at some future time. There is no presumption that the parent who resides with a child is to pay the child for services in waiting on and caring for her, and in the absence of an express agreement to pay for such services, care and attention, a recovery cannot be had. Bolling v. Bolling, 146 Ky. 313; Allen v. Allen, 158 Ky. 760; Turner v. Young's Exor., 155 Ky. 607; Armstrong's Admr. v. Shannon, et al., 177 Ky. 547; Ballard v. Ballard, 177 Ky. 260; Weir v. Weir's Admr., 3 B. M. 645.

Jerry Atha should be charged with the $2,000 which he received from his mother's estate as well as the $404.00 personal property and $100.00 in cash which he received from his father's estate. He should then be given credit for the $759 expended by him in burying his father and mother and erecting the monument, and any other sums lawfully expended in the administration of the estate, and these sums should be deducted from the $2,504.00 with which he is charged, and he should be required to pay to Isabell and Joan Webster one-half of the remaining sum, after the cost of this litigation has been paid.

The judgment is therefore reversed with direction to enter a judgment in conformity to this opinion.